J^PETTIGREW, J.
This is an action to establish paternity and seek support instituted by the State of Louisiana, Department of Social Services (“the State”), in the interest of Marquetta M. Harrison, the minor child of Zorlee H. Hayes. Named as a defendant herein is Theodore Johnson. Following the rendition of a judgment in favor of the State declaring Mr. Johnson to be the child’s biological father, Mr. Johnson now appeals.
PACTS
In its petition filed in this matter, the State alleges that the defendant, Theodore Johnson (“Mr. Johnson”), had a sexual relationship with Zorlee H. Hayes[1] (“Mrs. Hayes”), which led to the conception and subsequent birth on May 22, 1984, of Mar-quetta M. Harrison (“Marquetta”). As part of its standard child support petition, the State alleged that “The mother and/or custodian is receiving AFDC benefits on behalf of said children) or has applied for the services provided by Support Enforcement Services in obtaining support for said children) pursuant to the provisions of LA. R.S. 46:236 et seq.”[2] Mr. Johnson answered the suit, and further responded to a Written Request For Admission Of Facts put forth by the State.[3] Therein, Mr. Johnson stated that he did “not recall a sexual relationship with [Mrs. Hayes]” and further, “that the minor child, Mar-quetta ... is not his child.”
On October 30, 1991, the State filed ex parte an Amended Motion and Order for Paternity Blood Test compelling Mr. Johnson to submit to a blood test on November 27, |⅞1991. This order was signed by the family court magistrate on November 4, 1991.[4] Presumably, in response to the Louisiana Supreme Court’s ruling in In Interest of J.M., 590 So.2d 565 (La.1991), the State, on July 15, 1992, filed a rule to show cause as to why a blood test order should not be granted.[5] In its judgment, on rule, the family court appointed AUG, Inc. to conduct a blood test for the determination of paternity and ordered that Mr. Johnson submit to said test on September 23, 1992. The blood test report filed into the record by the State concluded that “there [was] a high likelihood” that Mr. Johnson was Marquetta’s father.
Mr. Johnson responded by filing an objection to the adequacy of the blood-testing procedure, the chain of custody, and the *390 report’s identity of the mother. Following a hearing, the family court, on April 18, 1994, ruled that Mr. Johnson’s objection as to the “missing link” in the chain of custody was valid, and disallowed the introduction of the blood test results. Upon the filing of a second rule to show cause, the family court appointed Gen Test Laboratories, Inc., to conduct a second blood test for the purpose of determining whether Mr. Johnson was Marquetta’s father. For reasons not set forth in the record, the results of this second blood test were disallowed. Thereafter, a third blood test was conducted, this time by Fairfax Identity Laboratories of Fairfax, Virginia. In connection therewith, a Paternity Evaluation Report was rendered on August 7, 1996. The report indicated that Mr. Johnson was not excluded as the father of Marquetta, and further that his probability of paternity was 99.9996 percent.
Once again, Mr. Johnson responded by filing objections to the chain of custody, the report’s identity of the mother, and also, sought a motion in limine excluding use of the report. Following a hearing, the family court, on January 28, 1997, issued judgment | .¿finding that Mr. Johnson had failed to establish a break in the chain of custody of the blood samples and overruled Mr. Johnson’s objections. The matter was ultimately tried on February 11, 1998, and the parties were permitted to submit post-trial memoranda.
The family court rendered judgment on June 12, 1998, decreeing Mr. Johnson to be Marquetta’s father. In its judgment, the family court stated “Whether or not the ‘rebuttable presumption’ of La. R.S. 9:397.3 is applicable is of no moment. The State by blood test results, absent the presumption, coupled with the witnesses’ testimony has met the burden of proof required to establish paternity.” A judgment to this effect was later signed on July 20,1998. As part of its judgment, the family court pretermitted the issues of child support, medical support, retroactive support payments, and immediate assignment of income, but expressly reserved to the parties the right to seek same at a future date. From this judgment, Mr. Johnson now appeals.
ISSUES ON APPEAL
In his appeal in this matter, Mr. Johnson presents the following issues for consideration by this court:
1. Whether the “rebuttable presumption” established by La. R.S. 9:397.3 is applicable to the facts of this case;
2. Whether the blood test results, coupled with the other evidence presented by the State, was sufficient to establish Mr. Johnson as Marquetta’s biological father;
3. Whether there existed, under the language of the statutes relating to blood testing, a sufficient basis for the family court’s establishment of paternity-
DISCUSSION
The first issue raised by Mr. Johnson questions whether the “rebuttable presumption” established by La. R.S. 9:397.3 is applicable to the facts of this case.
In 1995, the Louisiana legislature added La. R.S. 9:397.3(B)(2)(b) to provide:
A certified report of blood or tissue sampling which indicates by a ninety-nine and nine-tenths percentage point threshold probability that the alleged father is the father of the child creates a rebuttable presumption of paternity.
1995 La. Acts No. 1144, § 1. Therefore, upon the introduction of a blood test showing the alleged father to have a 99.90 percent or higher probability of paternity, it is presumed he is the father and the burden shifts to him to rebut the presumption. State in the Interest of Robinson v. Sims, 31,333, p. 4 (La.App. 2 Cir. 10/28/98), 721 So.2d 90, 92-3, writ denied, 98-2958 (La.1/8/99), 735 So.2d 640.
In his brief to this court, Mr. Johnson argues that the aforementioned statutory *391 presumption involves issues of substantive law and may not be applied retroactively in a suit filed prior to the enactment of the statute. Mr. Johnson fails to cite any authority for his position, and La. R.S. 9:397.3(B)(2)(b) does not state whether it should be applied retroactively or merely prospectively.
For its part, the State argues that the establishment of a rebuttable presumption is an evidentiary procedure requiring retroactive application. The State cites La. Civ.Code art. 6, which provides:
In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
Additionally, the State cites State v. Pesina, 541 So.2d 370 (La.App. 2 Cir.1989), a case that addressed the retroactive application of a 1988 legislative amendment changing the evidentiary effect of La. R.S. 9:397.3(D). Following trial, and pursuant to Act 298 of 1988, the legislature deleted a portion of the statutory language so as to provide that an “unchallenged” paternity blood test is prima facia proof of paternity. In Pesina, the second circuit held:
The paternity blood test provisions are legislatively imposed procedures obviously designed to benefit children as well as those who seek to establish or avoid the effects of paternity. In this sense, the statutory change in the evi-dentiary effect of a blood test is procedural and retroactive, even though the result may substantively affect a litigant.
State v. Pesina, 541 So.2d at 370 (underscoring supplied).
The State also cites In the Interest of Landrum v. Matthews, 612 So.2d 854 (La. App. 1 Cir.1992), writ denied, 614 So.2d 87 (La.1993). In Landrum, a five-judge panel of this court, in an earlier, unpublished opinion in the same case, applied the 1988 amendment to La. R.S. 9:397.3(D) retroactively. The Louisiana Supreme Court later denied writs as to this issue. See, State of Louisiana In The Interest of Terranee David Ryan Landrum v. Matthews, 583 So.2d 483 (La.1991). In the cited subsequent appeal, this court declined to again review the matter on the grounds that, “the issue of retroactivity of Louisiana Revised Statute, Title 9:397.3(D) was decided by a five judge panel of this Court and writs were denied on this issue by the Louisiana Supreme Court.” Landrum, 612 So.2d at 856.
It is the opinion of this court, after a thorough review of the record and consideration of the purpose and intent behind the enactment of the statute, that the “re-buttable presumption” established by the amendment of La. R.S. 9:397.3 is procedural in nature, and may be applied retroactively to the facts of this case. The initial issue raised by Mr. Johnson is without merit.
The second and final issues raised by Mr. Johnson are whether, under the statutory construction, the blood test results coupled with other evidence presented by the State were sufficient to establish Mr. Johnson as Marquetta’s father.
Louisiana Civil Code article 209 A provides that a child, who is not entitled to legitimate filiation, must prove filiation as to an alleged living parent by a preponderance of the evidence in a civil proceeding. La. Civ.Code art. 209 A; State in the Interest of Bordelon v. Guichard, 94-1795, p. 12 (La.App. 1 Cir. 5/5/95), 655 So.2d 1371, 1379, writ denied, 95-1405 (La.9/15/95), 660 So.2d 454. Proof by a preponderance of the evidence means that taking the evidence as a whole, such proof shows that the fact or cause sought to be proved is more probable than not. McKenzie v. Thomas, 95-2226, p. 4 (La. App. 1 Cir. 6/28/96), 678 So.2d 42, 45-6, unit denied, 96-1855 (La.10/25/96), 681 So.2d 372. Although alone insufficient to prove paternity, scientific testing provides persuasive and objective evidence that can *392 help establish paternity by a preponderance of the evidence. Proof of paternity is a factual question, and a trial court’s determination of the issue should not be disturbed absent manifest error. Guichard, 94-1795 at 12, 655 So.2d at 1379-80.
|7In her pretrial deposition and later at trial, Mrs. Hayes testified that she had known Mr. Johnson all of her life, as their families had, at least until this point, been very close.[6] Mrs. Hayes stated that she was a close friend of Mr. Johnson’s younger sister, Janice, with whom she had gone to school.
Mrs. Hayes further testified that she and Mr. Johnson had discussed the prospect of an affair before his divorce became final. Mrs. Hayes claimed that she initially refused Mr. Johnson’s advances, because she was uncertain as to whether he would reconcile with his wife. Mrs. Hayes stated she did not want to “cause any friction.” Also, during this time, Mrs. Hayes and Mr. Johnson were members of the same church. Mrs. Hayes stated that while she would frequently encounter Mr. Johnson at church, their conversations were limited to an exchange of greetings and pleasantries.
After Mr. Johnson’s divorce became final, Mr. Johnson continued to call Mrs. Hayes, and according to Mrs. Hayes, their conversations became increasingly sexual. Mrs. Hayes claims that during one such conversation, Mr. Johnson bragged to her about his sexual prowess, and she challenged him to prove it. Mrs. Hayes further claimed that she and Mr. Johnson had arranged to meet on two previous occasions, but that she had changed her mind and failed to appear.
Mrs. Hayes alleged that she and Mr. Johnson engaged in sexual intercourse on one evening in August of 1983, purportedly for the purpose of establishing which one of them was more sexually proficient. In her testimony at trial, Mrs. Hayes stated that on this occasion, she telephoned Mr. Johnson and arranged to meet him at his home on East Mt. Pleasant Road in Zachary, Louisiana. Mrs. Hayes claimed that after speaking to Mr. Johnson, she telephoned her friend, Salena Hayes, before her tryst with Mr. Johnson that evening.[7] According to Mrs. Hayes, her daughter Marquetta was conceived as a result of this assignation.
Upon realizing that she was pregnant, Mrs. Hayes testified that she tried unsuccessfully to reach ■ Mr. Johnson by telephone. When she got no response, Mrs. Hayes stated that she tried to reach Mr. Johnson at his mother’s home. After leaving several messages for Mr. Johnson to contact her, Mrs. Hayes claimed that she disclosed to Mr. Johnson’s mother that she was pregnant with Mr. Johnson’s child.
Following this revelation, relations between the two families became quite tense, and Mrs. Hayes stated that she began attending a different church. In the final weeks of her pregnancy, Mrs. Hayes stated that she became sick, and the baby’s development slowed to the point that there was a question as to whether she had been mistaken about the date of conception. According to Mrs. Hayes, it had been very easy to pinpoint the date of conception because she denies having had sex with anyone else for two months before and after her tryst with Mr. Johnson. Mrs. Hayes ultimately gave birth to her daughter Marquetta on May 22,1984.
Mrs. Hayes testified that in August of 1984, she met her husband, Calvin Hayes, whom she later married in December of *393 1984. Mrs. Hayes testified that she had no conversation with Mr. Johnson until some years later, in 1990, when he allegedly telephoned her at her job at Lowe’s. Mr. Johnson purportedly questioned Mrs. Hayes about whether he was in fact Mar-quetta’s father, and then agreed verbally to provide $200.00 a month toward the support of Marquetta. However, Mrs. Hayes stated she never heard from Mr. Johnson again until she instituted the instant action.
While Mrs. Hayes freely conceded that she has sought welfare assistance in the past, she claimed that her motivation in filing the instant suit was that her daughter Marquetta might know her parentage and medical history. Mrs. Hayes claimed that she lflpostponed filing the instant suit in the hope that Mr. Johnson would voluntarily acknowledge and contribute to the support of Marquetta.
Mrs. Hayes’ testimony was corroborated by the testimony of her friend and confidant, Salena Hayes. Salena Hayes testified that when Mrs. Hayes told her that she was pregnant, Mrs. Hayes identified Mr. Johnson as the father of her unborn child. This point was further confirmed by the subsequent testimony of Mrs. Hayes’ biological mother, Catherine Harrison Coates, and that of her cousin, Frank-ither Raiford. Salena Hayes also testified that at the time of the alleged tryst, Mr. Johnson was living at his home on East Mount Pleasant Road. Salena Hayes confirmed that Mrs. Hayes did not meet Calvin Hayes until after she was pregnant, and further that Calvin Hayes was never rumored to have been Marquetta’s father.
In his testimony, Mr. Johnson stated that he is acquainted with Mrs. Hayes through “family ties, [and] going-to church in the community.” While Mr. Johnson admitted that he has spoken to Mrs. Hayes on the telephone, he could not recall when these phone calls took place. Mr. Johnson denied ever having a sexual relationship with Mrs. Hayes and further denied that sex was discussed during their telephone conversations. According to Mr. Johnson, his relationship with Mrs. Hayes was strictly a friendship, and neither he nor Mrs. Hayes ever initiated a sexual relationship.
Later in his testimony, Mr. Johnson stated that he would call Mrs. Hayes for the purpose of picking her up for choir rehearsal and to let her know about choir practice and other church functions. Mr. Johnson stated that at the time of the assignation alleged by Mrs. Hayes, he was not living in the house on East Mount Pleasant Road, but was living at his mother’s home. According to Mr. Johnson, his former wife was living at the East Mount Pleasant Road address, and pursuant to a community property settlement agreement, dated August 12, 1983, he was required to give his ex-wife thirty days in which to vacate the premises. Mr. Johnson claimed that he did not move back into the house until the second week of September 1983. On cross-examination, Mr. Johnson conceded that the agreement in question contained no such provision.
linAt trial, the State put forth the testimony of Dr. Amanda Sozer, Associate Director of Paternity, at Fairfax Identity Laboratories, in Fairfax, Virginia. According to Dr. Sozer, the Fairfax Lab is accredited by the American Association of Blood Banks (AABB) and licensed by the State of New York, which both conduct regular, on-site inspections. In addition, the Fairfax Lab has been given NFSTC certification, and its accreditation has never been questioned or lost. Dr. Sozer was qualified and accepted by the court as an expert in DNA-based testing for the establishment of paternity.
In connection with her testimony at trial, Dr. Sozer produced copies of the original autoradiographs or x-ray films of the DNA analysis conducted by her lab. Copies of these films had previously been provided to defense counsel pursuant to discovery requests. Dr. Sozer stated that copies of autoradiographs produced in re *394 sponse to discovery requests are not always as clear as the original films. Unfortunately, a band on one of the probes was light and difficult to see. For this reason, Dr. Sozer stated that she had the case repeated to make it easier to see and also to show that the bands were in fact present. Dr. Sozer testified that after sizing the autoradiographs twice, her lab generates an internal DNA review report that is then transferred electronically to a computer program from which a report is produced. Thereafter, the case file is reviewed by a lab technician, and then the both the case file and the autoradiographs are reviewed by the lab director who signs and issues the report. Dr. Sozer admitted that she personally evaluated all of the information, case samples, calculations, and results on this test. The results of the test yielded a 99.9996 percent probability of paternity, indicating that Mr. Johnson was 240,000 times more likely to be the biological father of Marquetta than a randomly selected black male.
On cross-examination, Dr. Sozer was questioned regarding her lab’s standard use of a 50 percent prior probability as to the nongenetic evidence used to report a probability of paternity value. Dr. Sozer explained that a given case could be calculated using a larger or smaller prior probabilities; however, to standardize its reports, her lab always uses a neutral value of 50 percent prior probability, which is recognized as an industry standard. This probability assumes that at least 50 percent of the time the mother will h identify the correct male as her child’s biological father. Dr. Sozer stated that some labs use a prior probability of near 75 percent, thereby increasing the probability of paternity, because it assumes that at least 75 percent of the time the mother will identify the correct male as the biological father of her child.
Dr. Paul Goldstein was called to testify as an expert witness on behalf of Mr. Johnson. Dr. Goldstein testified that he is a professor of genetics at the University of Texas at El Paso, where he teaches basic and advanced genetics courses, that include the theory and usage of DNA. Dr. Goldstein further stated that he has published over sixty biological science articles relating to the function of DNA, and that he is the editor of two biology journals. While he does not personally conduct paternity tests, Dr. Goldstein stated that he has analyzed paternity testing for over ten years and has been qualified as an expert in genetics and genetic testing in Pennsylvania and Georgia.
On cross-examination, Dr. Goldstein conceded that he had never conducted a paternity test, nor had he worked inside of an AABB lab. Dr. Goldstein stated that he had analyzed paternity tests. Dr. Gold-stein was ultimately accepted by the court as an expert in the field of genetics and genetic testing.
In his testimony, Dr. Goldstein stated that he had reviewed the paternity documentation provided to him by the State. Dr. Goldstein’s unsubstantiated testimony was that some of the pipettes used by the Fairfax lab were not properly calibrated. According to Dr. Goldstein, uncalibrated pipettes could result in an overloaded sample that would decrease the resolution of the bands. Dr. Goldstein pointed to the light band previously referred to by Dr. Sozer and claimed that said band was missing. In Dr. Goldstein’s opinion, the absence of this band indicated that either the test was improperly run or that Mr. Johnson was not the biological father of Marquetta.
The State recalled Dr. Sozer who reiterated that her lab is subject to regular on-site inspections. Dr. Sozer further indicated that merely because a particular pipette is due to be fixed does not mean that said pipette was used in testing. In response to Dr. Goldstein’s assertion that a band was missing, Dr. Sozer stated that although faint, the band in question was present, but that this would not in any event invalidate the test. Dr. 11?,Sozer then proceeded to point out the presence of the *395 band to the family court judge. The transcript in the record reflects that the judge acknowledged that the band in question was discernible.
After a thorough review of the entire record, we conclude that the family court did not manifestly err in its determination that based upon the blood test results and the evidence adduced at trial, the State established that Mr. Johnson was the biological father of Marquetta by a preponderance of the evidence. Thus, the second and final issues raised by Mr. Johnson are without merit.
CONCLUSION
For the above and forgoing reasons, the judgment of the family court is affirmed. All costs associated with this appeal are assessed against Mr. Johnson.
AFFIRMED.

. It should be noted that while the pleadings and the testimony at trial reflect the mother’s name as "Zorlee Hayes,” Mrs. Hayes stated in her deposition that her name was actually “Zoalee Hayes.”

. The State’s Petition To Establish Paternity And Support was filed on August 8, 1991. In her subsequent testimony at trial on February 11, 1998, Mrs. Hayes denied that this matter was initiated because she was receiving welfare benefits. Mrs. Hayes stated that she did not begin to receive welfare benefits from the State until about eight years ago when her daughter was five years old.

. At the outset of trial, counsel for Mr. Johnson pointed out to the court that while his client had filed an answer to the suit on September 5, 1991, said answer was not contained within the record. Accordingly, counsel for Mr. Johnson requested leave of court to file a stamped copy of said answer. Counsel for the State acknowledged that an answer had been filed, and further stated that she had no objection to the supplementation of the record. This was evidently never done.

. The State alleges in brief that it previously filed an ex parte Motion and Order for Paternity Blood Test and further that all parties were ordered to submit to a blood test scheduled for October 9, 1991. Said motion and order are not found within the record.

. In the case of In Interest of J.M., 590 So.2d 565 (La.1991), the Louisiana Supreme Court determined that while a court order for blood testing is a search and seizure for constitutional purposes, the establishment of a child's paternity is a legitimate State interest. Because blood tests provide a minimally intrusive method for facilitating a demonstration of paternity, they are permissible provided that the unwavering putative father is provided a contradictory hearing beforehand.

. Mrs. Hayes slated that although she is not related to Mr. Johnson by blood, she was raised by her mother’s sister and her husband; i.e., her aunt and uncle. Her aunt’s husband was also Mr. Johnson’s paternal great uncle.

. At trial, Salena Hayes explained that she is not related to Mrs. Hayes’ present husband, Calvin Hayes. Salena Hayes further stated that on the night of Mrs. Hayes’ alleged tryst with Mr. Johnson, Mrs. Hayes did not call, but stopped by her house to advise her of her plans.